**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**ANTHONY KEVIN SUTTON,**
        **Plaintiff,**

**vs.**                                         **3:05cv395/LAC/MD**

**MARSHA NICHOLS,**
        **Defendant.**

---

**REPORT AND RECOMMENDATION**

**This case filed pursuant to 42 U.S.C. § 1983 is now before the court upon the defendant's special report (doc. 25) filed on June 26, 2006. The pro se plaintiff, who is proceeding *in forma pauperis* in this action,[1] filed an affidavit in opposition to defendant's motion for summary judgment on January 26, 2007. (Doc. 40).   On February 8, 2007, this court entered an order advising the parties of the importance and ramifications of Rule 56 summary judgment consideration, and informing the parties that the special reports would be construed as motions for summary judgment as of March 12, 2007. (Doc. 41). Nothing further was filed by either party.**

**Upon review of the submissions of the parties, it is the opinion of the undersigned that the defendant's motion for summary judgment should be granted.**

---

[1]Court records reflect that plaintiff paid the initial partial filing fee of $4.75, but failed to make any additional payments.   Therefore, plaintiff still owes $145.25 to the court.

**Background**

    **Facts as presented by Plaintiff**

        In his second amended complaint (doc. 10) (henceforth "complaint"),[2] plaintiff complains of an Eighth Amendment violation stemming from improper treatment of a knee injury.  He states that on May 20, 2005 he was transported to the Regional Medical Center at Lake Butler C.I. for a consultation with a knee specialist for a right ACL knee brace.  On June 7, 2005, he was transferred to Santa Rosa CI where he is currently incarcerated for placement on close management.  On June 19, 2005, plaintiff states that he initiated sick call for a low bunk pass because of the pain he was in from climbing up and down from the top bunk.  On June 20, 2005 he was seen by RN Beasley, but did not receive any treatment.  On July 12, 2005 he was seen by A.R.N.P.[3] Nichols, who removed his knee brace based only on her personal opinion, rather than a diagnostic MRI or x-rays.  A.R.N.P. Nichols also denied plaintiff any further treatment, denied his request for a low bunk pass, and documented that there was nothing wrong with the plaintiff's knee.

        Plaintiff signed up for sick call again on July 14, 2005 but received no treatment.  He signed up for sick call on July 27, 2005 and was given treatment for his symptoms, although this was the same treatment he had previously been given that had proven to be ineffective at either healing or curing his symptoms.

        Plaintiff apparently did not sign up for sick call again until September 21, 2005, when he complained to extensive pain and told medical personnel that the medication he had been given was not working.  He states that he was "put down to see M. Nichols but was never seen."

        On October 11, 2005 plaintiff signed up for sick call, complaining of pain in his right knee.  Nurse Beasley gave him an ace bandage and re-scheduled him to see

---

   [2]The allegations in this complaint were sworn under penalty of perjury on December 19, 2005.  The original complaint was filed on October 17, 2005.

   [3]ARNP denotes "Advanced Registered Nurse Practitioner."

M. Nichols.  On October 18, 2005, plaintiff saw A.R.N.P. Nichols and asked her for the brace back because it helped him more than the ibuprofen and ace bandage.  Ms. Nichols performed a "physical hand exam" to determine the nature of the damage.  After moving plaintiff's leg back and forth, plaintiff asserts that she stated that he was in no pain and there was nothing wrong with his knee.  She then began to question him about his complaints and told him that if he continued to lie he would be subject to disciplinary action.

Plaintiff states that Doctor McClunny, who he identifies as "a knee surgeon at Lake Butler C.I.." documented on May 20, 2005 that plaintiff had a torn ACL and plaintiff was given a knee brace to minimize the pain and help heal the injury.  He claims that A.R.N.P. Nichols has been deliberately indifferent to his plight, even after he filed grievances, and that because she deprived him of the brace he has suffered physical and mental pain, specifically including bruises to his knee, and sleepless nights.  He seeks reimbursement for medical fees he has paid and compensation for medical and mental damages.

Facts as presented by Defendant A.R.N.P. Nichols

Plaintiff first complained of bilateral knee problems while walking on January 26, 2004.  (Doc. 25, exh. E-4).[4]  Examination revealed no signs of edema or redness, plaintiff was able to bend well, and there was no audible popping.  No deformity or dislocation was noted.

Plaintiff was again seen by the medical department on March 25, 2004, complaining of bilateral knee and ankle pain.  (Exh. E-5).  Plaintiff stated that he was

---

[4]References to the exhibits to the special report will henceforth be referred to only by exhibit number.

injured in a car wreck in 2000.[5]  Although plaintiff's pain was noted at an 8 of 10, he stated that he played softball and worked on the inside grounds cutting grass.

Plaintiff was seen on April 2, 2004 complaining of bilateral knee pain (exh. E-6) and on May 3, 2004 complaining of low back pain and numbness in his left foot. (Exh. E-7).  On August 20, 2004, he was seen in medical complaining of pain in his ankles and feet. (Exh. E-8).  On August 24, 2004, plaintiff was seen by Dr. Summerlin at BCI complaining of pain in his knee and feet.  (Exh. E-9).  On September 24, 2004, plaintiff reported chronic pain in both knees due to a motor vehicle accident in 2001. The record noted that plaintiff would be scheduled for a brace consult.  (Exh. E-10).

On October 29, 2004, plaintiff was issued a knee brace at the H. McClunney Brace Clinic.  (Exh. E-11) There is no documentation to suggest that plaintiff was seen by an orthopedist nor was there any documentation that x-rays were done. (Exh. E-11; Exh. G-1 at 3).   On April 18, 2005, a consultation was completed for plaintiff to be seen at the H. McClunney Brace Clinic for repair of his knee brace. (Exh. E-12).

On April 19, 2005, an x-ray was taken of plaintiff's right knee.  The x-ray showed normal soft tissue and bony architecture and showed no fracture or dislocation.  (Exh. E-13).

On May 20, 2005, plaintiff was seen at McClunney Brace Clinic and was given a "small right week endes [sic] ACL brace."  (Exh. E-14).

On July 5, 2005, plaintiff was seen by A.R.N.P. Nichols for evaluation of his request for low bunk, knee brace and waist braces passes.  During the examination, Nichols asked plaintiff about his hand.  Plaintiff stated that he had injured his right index finger while playing handball.  Nichols then asked plaintiff how he plays handball with the large metal knee brace and he responded that he was not wearing it at the time. When Nichols asked plaintiff how he could play handball without the

---

[5]Upon plaintiff's intake into the Department of Corrections, he completed a Family, Social and Medical History indicating that he had not had swollen or painful joints, bone, joint or other deformity or foot trouble. (Exh. E).

brace, plaintiff "started smiling and stopped talking."  (Exh. E-15).  The plaintiff's record reflects that there was an emergency room sheet regarding a softball injury in 2003, but that there were no orthopedic consults for the knee, nor were there any MRI's.  The documented plan was for an in-depth review of plaintiff's chart to be conducted and for the plaintiff to be scheduled to see Nichols again in a week.

Plaintiff returned to A.R.N.P. Nichols on July 12, 2005 for follow-up evaluation regarding his request for low bunk and knee pass. (Exh. E-16).  Nichols removed the knee brace and conducted a range of motion test on plaintiff's right knee.  She observed that he had full range of motion, and no crepitus (cracking or creaking).  She also conducted an anterior drawer test, the pulling of the knee, with negative results.  Her examination revealed no laxness in the joints and no deformity.  After the exam, A.R.N.P. Nichols informed the plaintiff that she saw no indication for the knee brace as there were no x-rays to support it and no orthopedic exam of the knee, only the brace clinic visits.  The medical record notes that as plaintiff was ambulating out of the clinic he was twisting his ankle to appear unstable as he walked.  (Exh. E-16).

Plaintiff filed a grievance requesting a low bunk pass and the return of the knee brace.  The grievance was denied.  (Exh. E-16).

Plaintiff was seen in sick call on July 15, 2005, complaining of mild pain in his right knee.  No swelling was noted, and plaintiff was instructed about pain control and the use of heat/cold.  (Exh. E-17).

On July 20, 2005, Sergeant Engstrom reported to A.R.N.P. Nichols that plaintiff goes to the recreation pen, does dips on the dip bar, and walks around the pen with no evidence of knee problems.  Sgt. Engstrom also noted that plaintiff had been counseled about kicking his cell door.  (Exh. E-18)

Plaintiff received a DR for Participating in a Disturbance on July 26, 2005, and was taken to the emergency room after chemical agents were used on him.  Plaintiff

was ambulatory with a steady gait, and the record did not note any complaints regarding plaintiff's right knee.  (Exh. E-19).

On July 28, 2005, plaintiff was seen by the medical department after placing a sick call request.  He complained of intermittent right knee pain, especially with flexion and weight bearing.  At that time he claimed that the pain originated from an old basketball injury.  Examination revealed minimal crepitus with passive range of motion and mild medical soft tissue edema.  (Exh. E-20).

Plaintiff was seen on September 6, 2005 complaining only of problems with his right hand.  There was no record mention of problems or pain associated with his right knee.  (Exh. E-21).  Plaintiff placed another sick call request and was seen in medical on September 22, 2005 complaining of severe pain in his right knee.  (Exh. E-22).  He stated that his knee gave out periodically and that the pain had been more severe since the brace had been removed in January of 2005.  Plaintiff's exam revealed no crepitus, and that plaintiff was able to bend his knee up and down with difficulty, but it was painful when moving his leg side to side.  He stated that the injury was caused due to a motor vehicle accident in 2000. The treatment plan was to continue analgesic balm and ibuprofen as previously ordered for pain and to discuss a possible referral for an MRI when he was seen by the A.R.N.P.  (Exh. E-22).

Plaintiff was seen of a re-check of his right hand problem on October 4, 2005. There was no complaint made about his knee at that time.  (Exh. E-23).  Plaintiff filed a grievance about the treatment he received for his hand, contending he should be scheduled to see a specialist.  The grievance was denied.

On October 13, 2005, plaintiff was seen by medical, again complaining about chronic pain in his right knee.  No swelling was noted.  The plan was for plaintiff to be seen by the A.R.N.P. in about a month.  Plaintiff was instructed on pain control and on keeping the extremity elevated.  (Exh. E-24).

On October 18, 2005, plaintiff was seen by A.R.N.P. Nichols again complaining about pain in his right knee, and requesting the return of the knee brace.  The record

reflects that plaintiff walked normally, had full range of motion in his right knee with no swelling, no laxness and no edema.  Defendant Nichols saw no need for a knee brace as the knee had not worsened without a brace.  (Exh. E-25).

On January 11, 2006 plaintiff was seen by the medical department and requested to get an ace wrap for his knee.  Plaintiff ambulated with a normal gait, had full range of motion in his right knee and had no crepitus or swelling.   Because his exam was normal, the request for ace bandage was denied.  Plaintiff was told not to participate in sports and to limit his exercise.  (Exh. E-26).

On March 1, 2006 plaintiff reported to medical after slipping coming out of the shower.  He complained that he could not move his right leg or walk.  Examination revealed that plaintiff bent his knee without difficulty and there was no crepitus or swelling.  Although he had been brought to medical in a wheelchair, the plaintiff left ambulatory with a steady gait and no difficulty.  (Exh. E-27).

Plaintiff was again seen by medical on March 2, 2006 complaining of discomfort in his right knee.   No discoloration or edema was noted, plaintiff ambulated without gait disturbance and had full range of motion.  (Exh. E-28).

The last medical record in the file is dated March 8, 2006, when plaintiff reported to medical complaining of back pain.  The record notes that he ambulated without difficulty.  (Exh. E-29).


<u>Plaintiff's Grievances</u>

Plaintiff filed several grievances with respect to his knee pain.  On July 11, 2005, he submitted a formal grievance seeking a low bunk pass.  He claimed that the defendant threatened to take his brace away from him and denied him a low bunk pass.  The grievance response indicated that the plaintiff's medical chart had been reviewed and there was no medical need for either a knee brace or a low bunk pass. (Exh. F).

On July 19, 2005, he filed an "emergency medical grievance" to the Secretary, challenging defendant's decision to remove the knee brace without consultation with a specialist.  The grievance was not accepted as a grievance of an emergency nature and was returned without action so that plaintiff could file it at the institutional level.  (Exh. F-1, F-2).

Plaintiff then filed an "emergency medical grievance" at the institution level on August 2, 2005 which was also returned without action because it was not an emergency.  Plaintiff was advised to sign up for sick call for his non-emergent medical needs.  (Exh. F-3).

He appealed the denial of his "emergency medical grievance" on August 18, 2005.  The appeal was denied with the notation that it is the responsibility of his Chief Health Officer to determine the appropriate treatment regimen for the condition he was experiencing, and that because he was scheduled for a follow-up in the near future he should discuss his concerns at that time, or make use of sick call.  (Exh. F-4; F-5).

Plaintiff filed an "informal grievance on medical" in October of 2005 again asking for the return of the brace.  The response indicated that the small ACL brace had been fitted to plaintiff's right knee due to MOTOR VEHICLE ACCIDENT of ten years previous, and that the presumed diagnosis of ACL injuries had not been confirmed.  Because no MRI was done prior to placing the brace, none was indicated to remove it, and in addition, the limited mobility of CM-I status made the brace unnecessary.  Finally, the response noted that there was no Dr. McClunny listed at R.M.C.  (Exh. F-6).  There is nothing in the record to indicate that he filed any further appeal.

### Affidavits

Defendant Nichols filed an affidavit explaining her qualifications and treatment of plaintiff Sutton.  (Exh. G-1).  She attests that she did not remove plaintiff's knee

brace until she had made a thorough review of his medical records, and that plaintiff had never presented any condition or physical affliction to her that was beyond her medical training and expertise.  (Exh. G-1 at 4).  She also notes that the staff at the H. McClunney Brace Clinic that fitted plaintiff for a brace in 2005 were not medical doctors.  She denies that any evil intent or malicious motive guided her treatment decisions and states that she is still of the opinion that a knee brace is not medically necessary.  (Exh. G-1 at 5).

Defendant has also presented the affidavit of Daniel P. Cherry, III, M.D.  (Exh. G-2).  Dr. Cherry is the DOC Director of Health Services, Clinical and has oversight responsibility for the delivery of health services to inmates in DOC custody.   Dr. Cherry reviewed the plaintiff's civil rights complaint and medical records, and concluded based on his personal knowledge, education, training and experience that plaintiff was provided appropriate medical care by A.R.N.P. Nichols.  (Exh. G-2 at 2).  He further states that in his opinion, there are no grounds to support any allegations of negligent or deliberately indifferent medical care, and that the care provided to the plaintiff met or exceeded the prevailing professional standards of medical care and that the confiscation of plaintiff's knee brace was appropriate.  (*Id.*)  Dr. Cherry summarized the plaintiff's treatment records and stated that it was his medical opinion that A.R.N.P. Nichols' decision to remove plaintiff's knee brace was a medically appropriate decision that would cause no harm to plaintiff given the reduced physical activity of inmates in Close Management I status and the fact that x-rays taken of plaintiff's right knee were normal, that there was no documentation of plaintiff being evaluated by an orthopedist and that the examination conducted by A.R.N.P. Nichols did not reveal that a knee brace was medically necessary.  (Exh. G-2 at 4).

The last affidavit presented by defendant is from SRCI corrections officer Colonel Jerry Long.  (Exh. G-3).  Colonel Long opines that in the absence of any medical direction that any additional implements are medically necessary for a Close

Management inmate, a potential security issue exists if a CM inmate is allowed to possess non-essential implements, such as a knee brace.  He notes that in his experience, inmates use medical improvements to secrete contraband or weapons or convert such items into weapons. (Exh. G-3 at 2).  Colonel Long explains that the physical activities of CM inmates are limited by their classification.  CM I inmates are, "for the most part of the twenty four (24) hour day confined to their cells and are not required to engage in any prolonged walking or running.  (Exh. G-3 at 2).  They are permitted out of their cells for showers, but the shower facilities are typically located on the same tier as their cells.  The record reflects that plaintiff's initial referral to CM I was due to his possession of a weapon.  (Exh. C)

## Legal Analysis

### Summary Judgment Standard

On a motion for summary judgment, this court must evaluate the record in the light most favorable to plaintiff as the nonmovant and grant defendants' motion only if the record demonstrates that there is no genuine issue of material fact and that defendants are entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986); *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002); F.R.C.P. 56.  The court must resolve all disputes and draw all inferences in the nonmovant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); see also *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1315 (11th Cir.1999).  Summary judgment is improper "[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact."  *Cornelius v. Highland Lake*, 880 F.2d 348, 351 (11th Cir. 1989), *cert. denied*, 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990).  An issue of fact is "material" if it might affect the outcome of the case under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986).  It is "genuine" if the record taken as a whole could lead a rational

trier of fact to find for the non-moving party. *Id.*; *see also Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986).   Finally, it is improper for the district court to make credibility determinations on a motion for summary judgment. *Miller v. Harget,* 458 F.3d 1251, 1256 (11th Cir. 2006); *Bischoff v. Osceola County,* 222 F.3d 874, 876 (11th Cir. 2000); *Harris v. Ostrout*, 65 F.3d 912, 916-17 (11th Cir. 1995); *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1531 (11th Cir. 1987).

### Eleventh Amendment Immunity

Plaintiff does not specifically state whether he sues defendant in her official or individual capacity.  Of course, to the extent plaintiff sues the defendant in her official capacity, she is entitled to Eleventh Amendment immunity.  A suit against a state employee in his or her official capacity is deemed to be a suit against the state for Eleventh Amendment purposes. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45, 58 (1989).   Absent waiver or express congressional abrogation, neither of which is present in this case, the Eleventh Amendment prohibits a suit against a state in federal court.  *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Gamble v. Florida Department of Heath and Rehabilitative Services*, 779 F.2d 1509, 1511 (11th Cir. 1986). Hence defendants are entitled to Eleventh Amendment immunity to the extent the plaintiff sues them in their official capacities.

### Qualified Immunity

Defendant also claims that she is entitled to qualified immunity from suit in her individual capacity.  The doctrine of qualified immunity shields government officials from suits against them in their individual capacities for those actions taken within the scope of their discretionary authority that do not violate a clearly

established constitutional right of which a reasonable person would have known given the circumstances and information possessed by the official at the time of the conduct.  *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Powell v. Ga. Department of Human Resources*, 114 F.3d 1074 (11th Cir. 1998).  For law to be clearly established, "pre-existing law must dictate, that is truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Lassiter v. Alabama A & M University*, 28 F.3d 1146, 1150 (11th Cir. 1994).  "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendants."  *Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993), modified on other grounds, 14 F.3d 583 (11th Cir. 1994).  For qualified immunity purposes, "we look to the law established by the Supreme Court, the courts of appeals, and the district courts." *Greason v. Kemp*, 891 F.2d 829, 833 (11th Cir. 1990); see also *Hartsfield v. Lemacks*, 50 F. 2d 950 n.9 (11th Cir. 1995).  If plaintiff's evidence would not support a reasonable jury's finding that the defendant violated plaintiff's constitutional rights, the issue of qualified immunity need not be addressed.  *Campbell v. Sikes*, 169 F.3d 1353, 1361-62 (11th Cir. 1999).

## Eighth Amendment

Although the United States Constitution does not require comfortable prisons, neither does it permit inhumane ones.  *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).  The Eighth Amendment governs "the treatment a prisoner receives in prison and the conditions under which he is confined. *Hellig v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993).  However, "[n]ot every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny."  *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).  After incarceration, only the 'unnecessary and

wanton infliction of pain' . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment. *Ingraham v. Wright*, 430 U.S. 651, 670, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (citations omitted)).

A prison official's deliberate indifference to the serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Campbell v. Sikes*, 169 F.3d 1353, 1363 (11th Cir. 1999). "However, not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.'" *Farrow v. West,* 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting *McElligott v. Foley,* 182 F.3d 1248, 1254 (11th Cir. 1999) (citation omitted)); *see also Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). The inadvertent or negligent failure to provide adequate medical care "cannot be said to constitute 'an unnecessary and wanton infliction of pain.'" *Estelle*, 429 U.S. at 105-06. Furthermore, because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are "serious." *Hudson v. McMillian*, 503 U.S. 1, 9 , 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992). To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry. *Farrow, supra; Taylor v. Adams*, 221 F.3d 1254, 1257 (11th Cir. 2000); *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995). First, a plaintiff must set forth evidence of an objectively serious medical need. *Taylor*, 221 F.3d at 1258; *Adams*, 61 F.3d at 1543. Second, a plaintiff must prove that the prison official acted with an attitude of "deliberate indifference" to that serious medical need. *Farmer v. Brennan*, 511 U.S. at 834 (1994); *McElligott*, 182 F.3d at 1254; *Campbell*, 169 F.3d at 1363.

**The Eleventh Circuit considers a serious medical need to be "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."** *Brown v. Johnson,* **387 F.3d 1344, 1351 (11ᵗʰ Cir. 2004) (citing *Farrow,* 320 F.3d at 1243 (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11ᵗʰ Cir. 1994)). In either instance, the medical need must be "one that, if left unattended, poses a substantial risk of serious harm." *Farrow,* 320 F.3d at 1243 (quoting *Taylor,* 221 F.3d at 1258 (quoting *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970)); *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970,1977, 128 L.Ed.2d 811 (1994). Circuit precedent recognizes a range of medical needs that are sufficiently serious to constitute "serious medical needs" for purposes of the Eighth Amendment and some medical needs that are not.⁶**

**To satisfy the subjective element of deliberate indifference to a prisoner's serious medical need, plaintiff must prove three things: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence."** *Bozeman v. Orum,* **422 F.3d 1265, 1272 (11ᵗʰ Cir. 2005) (quoting** *Brown v. Johnson,* **387 F.3d 1344, 1351 (11ᵗʰ Cir. 2004); see also** *Miller v. King,* **384 F.3d 1248, 1261 (11ᵗʰ  Cir. 2004) (noting, after** *Farmer v. Brennan,* **114 S.Ct. 1970**

---

⁶The *Farrow* court cited the following examples: *Adams v. Poag,* 61 F.3d 1537, 1539-41, 1543 (11ᵗʰ Cir. 1995) (asthma, with continual breathing problems and with intermittent wheezing, coughing, and hyperventilating, can constitute a serious medical need), and *Brown v. Hughes,* 894 F.2d 1533, 1538 (11ᵗʰ Cir. 1990) (painful broken foot can be serious medical need), and *Mandel v. Doe,* 888 F.2d 783, 788 (11ᵗʰ Cir. 1989) (evidence showing that plaintiff's leg collapsed under him, was deteriorating, caused pain when moved, and that he was virtually unable to walk, supported jury's conclusion that plaintiff had serious medical need), and *Aldridge v. Montgomery,* 753 F.2d 970, 972-73 (11ᵗʰ Cir. 1985) (one-and-a-half-inch cut over detainee's eye bleeding for two and a half hours was a serious medical need), with *Shabazz v. Barnauskas,* 790 F.2d 1536, 1538 (11ᵗʰ Cir. 1986) (inmate's "pseudofolliculitis barbae" or "shaving bumps," even if shaving required by prison officials when physician ordered otherwise, "does not rise to the level of the cruel and unusual punishment forbidden by the Eighth Amendment"), and *Dickson v. Colman,* 569 F.2d 1310, 1311 (5ᵗʰ Cir. 1978) (inmate's high blood pressure presented no "true danger" or "serious threat" to his health; he also had full range of motion in his shoulder despite continuing pain from a three-year old injury). See also *Brown v. Johnson,* 387 F.3d 1344 (11ᵗʰ Cir. 2004) (prisoner's HIV and hepatitis were serious medical needs);

(1994), that gross negligence fails to satisfy state-of-mind requirement for deliberate indifference)); *Farrow*, 320 F.3d at 1245-46 (citing *McElligott*, 182 F.3d at 1255; *Taylor*, 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need").   "Deliberate indifference" and "mere negligence" are not one and the same.  Deliberate indifference must be more than a medical judgment call or an accidental or inadvertent failure to provide adequate medical care.  *Murrell v. Bennett*, 615 F.2d 306, 310, n.4 (5th Cir. 1980).

Obviously, a complete denial of readily available treatment for a serious medical condition constitutes deliberate indifference. *Harris v. Coweta County*, 21 F.3d 388, 393 (11th Cir. 1994).  However, where the inmate has received medical attention, and the dispute is over the adequacy of that attention, courts should be reluctant to question the accuracy or appropriateness of the medical judgments that were made. *Harris v. Thigpen*, 941 F.2d 1495, 1507 (11th Cir. 1991)(quoting *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989)).  Disputes regarding the level of treatment or the existence of other treatment options do not alone evidence cruel and unusual punishment. *Estelle*, 429 U.S. at 107, 97 S.Ct. at 292; *Hamm*, 774 F.2d at 1575.  A difference of opinion over matters of medical judgment does not give rise to a constitutional claim.  *Campbell v. Sikes,* 169 F.3d 1353, 1363 (11th Cir. 1999); *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989).  Nonetheless, the court can find that the medical treatment was so slight as to amount to no treatment at all, and therefore the mere fact that treatment was provided does not end the inquiry. *Waldrop*, 871 F.2d at 1035. Similarly, grossly incompetent medical care or choice of an easier but less efficacious course of treatment can constitute deliberate indifference. *McElligott*, 182 F.3d at 1255.  For instance, "an official acts with deliberate indifference when he knows that an inmate is in serious need of medical care, but he fails or refuses to

obtain medical treatment for the inmate." *Farrow,* 320 F.3d at 1246 (quoting *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997)).

Alternatively, "[e]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *Farrow,* 320 F.3d at 1246 (quoting *McElligott*, 182 F.3d at 1255). "The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay." *Bozeman v. Orum*, 422 F.3d 1265, 1272 n. 11 (11th Cir. 2005) (quoting *Harris v. Coweta County*, 21 F.3d 388, 393 (11th Cir. 1994)). A defendant who delays necessary treatment for non-medical reasons may exhibit deliberate indifference. *Farrow*, 320 F.3d at 1246 (citing *Hill*, 40 F.3d at 1190 n. 26; *H.C. by Hewett v. Jarrard*, 786 F.2d 1080, 1086 (11th Cir. 1986) (citing *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985))). "[D]elay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition and considering the reason for delay." *Hill,* 40 F.3d at 1189. "[A]n official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay." *Bozeman v. Orum*, 422 F.3d 1265, 1272, n. 11 (11th Cir. 2005) (quoting *Lancaster v. Monroe County, Ala*., 116 F.3d 1419, 1425 (11th Cir. 1997); accord *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1187 (11th  Cir.1994); *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990); *Thomas v. Town of Davie*, 847 F.2d 771, 772 (11th Cir. 1988); *Aldridge v. Montgomery*, 753 F.2d 970, 972-73 (11th Cir. 1985)).

## Conclusions of Law

Defendant first asserts that plaintiff has failed to show a "serious medical need."  "A serious medical need is considered 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.' "  *Brown v. Johnson,* 387 F.3d at 1351 (11th Cir. 2004) (citations omitted).  In either case, "the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." *Id.* (citation and internal quotations marks omitted).  Plaintiff's knee injury does not rise to the level of a serious medical need.

Plaintiff's knee brace was issued by H. McClunney.  This individual is not a licensed physician in the State of Florida.  (Exh. H).  Before the brace was issued, x-rays were not taken and there was no evaluation by an orthopedic specialist.  (Exh. G-1).  X-rays that were subsequently taken were normal.  (Exh. E-13).  Plaintiff played softball and other sports during his incarceration with the DOC, even when he did not have his knee brace.  (Exh. E-2, E-3, E-14).  The record reflects that the condition of plaintiff's knee did not deteriorate after the brace was removed.  (Exh. E-25).  Although plaintiff made repeated complaints, examinations consistently revealed minimal or no edema or crepitus, full range of motion, and ability to ambulate without difficulty.  (Exh. E).  Plaintiff asserts in his reply that a diagnosis of arthritic pain and chronic epistaxes (Exh. E-6, 7) is sufficient to support a finding that he had a serious medical need.  The court does not concur.  Plaintiff's activity level, his description of his knee injury and pain as recorded in medical records and grievances, and defendant's observations and examinations of him, do not establish a serious physical condition of constitutional proportion.

Even assuming for sake of argument that the plaintiff's knee condition rose to the level of a serious medical need, the plaintiff has failed to satisfy the subjective element of deliberate indifference by establishing "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005) (quoting *Brown*

*v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004); see also *Miller v. King*, 384 F.3d 1248, 1261 (11th Cir. 2004).   Instead, this appears to be a classic example of disagreement or dissatisfaction with the course of treatment provided. Such disagreement does not rise to the level of a constitutional violation. See *Estelle*, 429 U.S. at 107, 97 S.Ct. at 292; *Hamm*, 774 F.2d at 1575; *Campbell,* 169 F.3d at 1363; *Harris*, 941 F.2d at 1505; *Waldrop*, 871 F.2d at 1033; *see also Wiggins v. Zein*, 108 Fed. Appx. 148 (5th Cir. 2004) (defendants who provided pain medication, x-rays, ice packs, Ace bandages, and crutches for plaintiff's knee injury were not deliberately indifferent to plaintiff's medical needs; plaintiff's allegations established at most negligence or a disagreement with the treatment received); *Scott v. Wiley*, 66 Fed. Appx. 526 (5th Cir. 2003) (mere disagreement with treatment provided for knee injury, including multiple examinations, pain relief, excusal from work assignments and recommendation for further evaluation and x-rays was not actionable under § 1983); *Bieber v. Wisconsin Dept. Of Corrections*, 62 Fed. Appx. 714 (7th Cir. 2003) (substitution of elastic sleeve for metal knee brace due to security concerns did not state § 1983 violation where staff was unaware of inadequacy of replacement or that metal brace was "essential" to treat inmate's injury); *Lerma v. Bell*, 2 Fed. Appx. 782 (9th Cir. 2001) (confiscation of elastic knee brace for legitimate security concerns did not state § 1983 violation); *Turner v. Sina*, 62 F.3d 1419 (7th Cir. 1995) (Table, text in WESTLAW) (even if plaintiff's recurring knee problems were serious medical need, the fact that he received comprehensive treatment precluded a § 1983 claim); *Moody v. Pickles*, 2006 WL 2645124, at *6-*7 (N.D.N.Y. 2006) (finding that knee injury did not constitute serious medical need under Eighth Amendment and collecting other similar cases).   There is no evidence in this case that defendant Nichols decided to remove the brace for any other reason than her sound and well-reasoned medical judgment that the knee brace was not medically necessary.  (Exh. G-1).  There is no evidence of malice or bias against the plaintiff.  To the contrary, plaintiff received medical attention for his knee, and this court should not question the accuracy or

appropriateness of the medical judgments that were made, particularly when A.R.N.P. Nichols' medical determinations were approved by a physician after reviewing the plaintiff's medical records.  *See Harris*, 941 F.2d at 1507 (quoting *Waldrop*, 871 F.2d at1035).

After a comprehensive review of the record, the court finds that plaintiff has failed to establish a constitutional violation with respect to the treatment he received for his knee.  Thus, the court need not reach the issue of qualified immunity.


Accordingly,  it is respectfully RECOMMENDED:

That defendant's special report, construed as a motion for summary judgment (doc. 25) be GRANTED, and that the clerk be directed to enter judgment in favor of the defendant and close the file.


At Pensacola, Florida, this 4th day of May, 2007.


/s/ *Miles Davis*
**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts,* 858 F.2d 698, 701 (11th Cir. 1988).**